**CITIZENS' COMMITTEE TO SAVE OUR CANYONS and Wasatch Mountain Club, nonprofit organizations; William Thompson and Gavin Noyes, individuals, Plaintiffs–Appellants,**

v.

**UNITED STATES FOREST SERVICE; Bernie Weingardt, Forest Supervisor, Wasatch–Cache National Forest; and Peter W. Karp, Forest Supervisor, Uinta National Forest, Defendants–Appellees,**

and

**Snowbird Corporation, Intervenor–Appellee.**

No. 01–4082.

United States Court of Appeals, Tenth Circuit.

July 23, 2002.

Joro Walker (Bruce Plenk with her on the briefs), Salt Lake City, UT, for Plaintiffs–Appellants.

Todd S. Aagaard, Attorney, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, DC (Andrew Mergen, Attorney, U.S. Department of Justice, Environmental & Natural Resources Division, Washington, DC; John C. Cruden, Acting Assistant Attorney General, Washington, DC; Maggie L. Hughey and Stephen L. Roth, Assistant United States Attorneys, District of Utah, Salt Lake City, UT; and Elise Foster, Office of General Counsel, U.S. Department of Agriculture, Washington, DC, with him on the brief), for Defendants–Appellees United States Forest Service, Bernie Weingardt, and Peter W. Karp.

Martin K. Banks (Mark E. Hindley with him on the brief), Stoel Rives LLP, Salt Lake City, UT, for Intervenor–Appellee Snowbird Corporation.

Before EBEL, Circuit Judge, McWILLIAMS, Senior Circuit Judge, and BROWN,* Senior District Judge.

EBEL, Circuit Judge.

This case centers around privately and publicly owned lands located in Northern Utah and the interactions between Defendant–Appellee United States Forest Service and Plaintiffs–Appellants Citizens' Committee to Save Our Canyons, the Wasatch Mountain Club, William Thompson, and Gavin Noyes (collectively SOC) regarding development plans for the Snowbird Ski and Summer Resort. At issue is whether the Forest Service complied with the National Environmental Policy Act (NEPA), 42 U.S.C. § 4321 et seq., and the National Forest Management Act (NFMA), 16 U.S.C. § 1601 et seq., in carrying out two transactions involving Snowbird. In one transaction, the Forest Service approved, as part of a larger plan, the construction of large resort facility on Hidden Peak, a mountain owned by the federal government but used by Snowbird pursuant to a special use permit. In another transaction, the Forest Service transferred to Snowbird small fractions of land in return for land adjacent to other federal property. Both of these transactions occurred while Snowbird was undertaking operations to improve its resort capacity.

SOC alleges that the Forest Service's handling of these transactions was arbitrary and capricious in several respects. It contends that the Forest Service authorized the land exchange (called the Interchange) without first giving sufficient public notice, and that the Forest Service did not receive an equal value of land in exchange. In addition, it argues the Forest Service did not consider a sufficient number of alternatives before authorizing the Hidden Peak structure. Finally, it claims the Forest Service improperly amended an existing forest plan to allow for the Hidden Peak building.

The United States District Court for the District of Utah rejected SOC's arguments, and, exercising jurisdiction pursuant to 28 U.S.C. § 1291, we affirm.

I. *Background*

Snowbird owns and operates a ski resort located twenty-five miles southeast of Salt Lake City, Utah. All parties agree that Snowbird is a ski resort of some significance, and during the 1998–99 ski season over 380,000 people visited the resort. The resort itself is comprised of 881 acres of private land (called the Mineral Basin)

---

* The Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, sitting by designation.

and 1,674 acres of public land located within the Wasatch–Cache National Forest ("WCNF"). In 1979, the Forest Service issued a special use permit to Snowbird that allowed the resort to establish ski operations on national forest land. Because of its special use permit, Snowbird is required to submit periodically a master development plan outlining its long-range plans for the resort and the public lands it utilizes.

### A. *Master Development Plan*

In 1997, Snowbird submitted a master development plan (MDP) to the Forest Service. In the MDP, Snowbird proposed extensive changes to its resort operations. In addition to calling for a general upgrade in operations, increased snowmaking equipment, additional chair lifts, and improved hiking trails, the MDP proposed the construction of a 78,000 square-foot conference center and resort facility on an area known as Hidden Peak, which is within the public property Snowbird uses pursuant to a special use permit. The facility proposed by Snowbird would be considerably larger than the existing ski tram and 1,700 square foot ski patrol and skier service center currently located on Hidden Peak. Under Snowbird's proposal, the new structure would essentially replace the two existing structures and would contain space for "a restaurant, lounge, meeting rooms, an interpretive area, retail space, ski patrol quarters, restrooms, snowcat garages, and a maintenance area."

In its MDP, Snowbird argued that the larger structure was needed because the limited nature of the existing Hidden Peak facilities adversely affected the resort in a number of ways. Ski and equipment rental offices, as well as restaurants, currently sit below Hidden Peak at the base of the resort, making Hidden Peak less amenable to skiers. In addition, although consid-

ered a world class facility in many regards, in recent years Snowbird has been unable to meet all the requests for its services and facilities. In 1997, for example, Snowbird turned away 19 percent of conference requests because of space limitations. The limited space on Hidden Peak also adversely affects activities across the resort, limiting skier circulation and making general use of the resort less efficient.

Because Hidden Peak is located on land owned by the federal government, any substantial structures on the region require Forest Service approval, which, in turn, implicates NEPA. On May 17, 1997, the Forest Service began the NEPA process by announcing its intent to prepare an Environmental Impact Study (EIS) examining Snowbird's proposal and by sending a scoping document, which outlined Snowbird's proposal and solicited public comments to over 1,000 individuals and organizations. In addition, on July 19 and 30, 1997, Snowbird held a public open house to discuss its proposal. A year later, in October 1998, the Forest Service published a draft EIS (DEIS) that consolidated several possible courses of action, including a no-action alternative, the Snowbird-proposed 78,000 square-foot structure, a considerably smaller, 22,000 square-foot structure, and the preferred alternative, a middle-sized structure ranging from 22,000 to 50,000 square-feet. In addition to discussing the proposed alternatives, the Forest Service outlined, as required by NEPA, alternatives that it had analyzed but not considered in detail. These "rejected alternatives" included a proposal to locate the Hidden Peak development at a different resort area altogether and a proposal to maintain the current sized structure, though with internal upgrades. The Forest Service justified not examining these alternatives in detail on the grounds that they would not meet the needs identified in the MDP.

In addition, the DEIS pointed out that the current Hidden Peak buildings violated an existing provision of the WCNF Forest Plan prohibiting structures that might interfere with mountain views from being built on Hidden Peak.[1] An amendment to the existing Forest Plan, the DEIS explained, would be necessary to accommodate any Hidden Peak structure, even the existing structures.

On December 12, 1999, the Forest Service issued a final EIS (FEIS) and a Record of Decision (ROD) authorizing the construction of the Forest Service's preferred alternative, which, among other things, authorized the construction of "a building not to exceed 50,000 square feet" and amended the existing Forest Plan to permit the structure.

## B. *Mineral Interchange*

The proposal for a new structure on Hidden Peak specifically dealt with Snowbird's proposed development on federal land. However, the MDP submitted by Snowbird also detailed activities it planned to undertake on its private land (land known as the Mineral Basin), regardless of whether the Hidden Peak structure received Forest Service approval.

Within the Mineral Basin are relatively small fragments of federally owned land known as mineral survey fractions.[2] In 1998, while the Forest Service studied Snowbird's MDP and Hidden Peak proposals, Snowbird approached the Forest Service and asked it to enter a transaction known as an interchange (the Interchange).[3] Under Snowbird's proposed interchange, the Forest Service would give Snowbird the fractions of land it owned in the Mineral Basin in exchange for 6.71 acres of land known as the "War Eagle" property. The Forest Service eventually approved this transaction in December 1998. Because the Forest Service concluded that under existing regulations the transaction did not pose a significant risk of impacting the environment, it "categorically excluded" the Interchange from NEPA review. Conflicting surveys, however, left the exact size of the land transferred by the government unclear, with government surveys placing the size at 1.98 acres, but surveys by Snowbird suggesting over nine acres may have been transferred by the Forest Service.

Although the Forest Service was considering the Interchange while simultaneously studying the MDP, the DEIS issued by the Forest Service in October 1998 did not mention the Interchange, though the FEIS, issued a year later, did.

The land received by Snowbird as a result of the Interchange took on added significance when Snowbird pressed forward with plans to develop the property it previously owned in the Mineral Basin. Prior to the Interchange, Snowbird owned the vast majority of land in the Mineral Basin. As part of its development plans for this property, Snowbird planned to construct two chairlifts (Mineral Lifts A

---

1. Under NFMA, the Secretary of Agriculture is required to develop forest plans that provide for the "coordination of outdoor recreation, range, timber, watershed, wildlife and fish, and wilderness" activities. 16 U.S.C. § 1604(e). These plans must strive to balance these competing interests while also preserving forests' environmental features. *See* 36 C.F.R. § 219.1(b).

2. Federal regulations define mineral survey fractions as "small parcels of National Forest System lands interspersed with or adjacent to lands transferred out of Federal ownership under the mining laws." 36 C.F.R. § 254.31.

3. An interchange is a transaction where the federal government and "another person exchange lands or interests in lands of approximately equal value without formal appraisal." 36 C.F.R. § 254.31.

and B), regardless of whether the Hidden Peak structure was approved or the Interchange occurred. Following the Interchange, however, Snowbird—which now owned all relevant land in the Mineral Basin—proposed an alignment for Mineral Lifts A and B that passed over land received from the Interchange.[4] Had the Interchange not occurred, the chairlifts still could have been constructed, but their alignment would have been different.[5]

SOC, a nonprofit environmental group, soon challenged both the Interchange and the Hidden Peak structure. Initially, SOC filed an administrative appeal before the Forest Service. But on March 13, 2000, the Forest Service rejected this appeal, and SOC then filed suit in the district court on May 3, 2000.[6] On July 27, 2000, the district court granted Snowbird's motion to intervene as a defendant.

Before the district court, SOC alleged that the Forest Service violated NEPA in several respects. First, it contended that the Forest Service violated NEPA by amending the Forest Plan and approving the Interchange without public comment. Second, it claimed that the Forest Service did not consider an appropriate range of alternatives when examining the Hidden Peak structure. Specifically, SOC argued that the Forest Service should have examined in more detail either constructing a facility smaller than 22,000 feet or not building a structure on Hidden Peak at all. Third, it asserted that the Forest Service acted arbitrarily and capriciously by not considering the Interchange and MDP/Hidden Peak proposal in a single EIS. In addition, SOC contended that the Forest Service acted arbitrarily and capriciously in classifying its amendment to the Forest Plan as "nonsignificant." SOC also claimed the Forest Service acted arbitrarily and capriciously when going forward with the Interchange because the Forest Service used inaccurate surveys in assessing the value of the land.

On April 10, 2001, the district court rejected SOC's arguments. In particular, it concluded that: the Forest Service proper-

---

4. The physical structure supporting the lifts remains on private property.

5. Alternatively, as all the parties acknowledge in supplemental briefing they filed with this court, Snowbird could have applied for an easement allowing its lift lines to transverse the federally owned lands.

6. In the opening pages of its brief, Snowbird alleges that four issues presented by SOC on appeal were waived for having not been raised properly during the administrative appeal. In particular, Snowbird argues SOC did not allege 1) that the Forest Service's "use of the exterior-boundary description" was improper; 2) that the Interchange "automatically triggered" other actions; 3) that the purposes and needs in the EIS were read too narrowly; and 4) that the Forest Service should have considered "off-peak" alternatives.

After reading through the record, we find that items 1, 2, and 4 were expressly raised in the administrative appeal. *See Kentucky* *Heartwood, Inc. v. Worthington,* 20 F.Supp.2d 1076, 1091 (E.D.Ky.1998). Arguably, SOC did not raise expressly the "automatically trigger" claim, but it did raise the larger "connected action" claim. *See Wilderness* *Soc'y v. Bosworth,* 118 F.Supp.2d 1082, 1100 (D.Mont.2000). Because our resolution of the larger connected action claim does not turn on the "automatically trigger" issue, the alleged waiver is not important to our discussion.

In a similar vein, the Forest Service contends SOC "raised for the first time on appeal" the argument that the "Forest Service was required to send notification of the proposed interchange to individuals .. who had commented on the Draft EIS for Snowbird's Master Development Plan." After reviewing the record, we agree with the Forest Service that this argument was not raised below. Though we reference this argument later, it is not central to the way we resolve the larger notice claim.

ly classified the Interchange as being categorically excluded from NEPA review; the Interchange and MDP were not connected actions; the Forest Service did not act arbitrarily and capriciously in concluding that the interchanged parcels were of approximately equal value; the Forest Service considered a sufficient range of alternatives when looking at the Hidden Peak project; and the Forest Plan amendments allowing for the Hidden Peak structure could be construed as nonsignificant.

Following the district court's order, SOC filed a motion with this court seeking an injunction pending appeal. SOC specifically asked that this court enjoin any construction in the Mineral Basin that might impact land transferred in the Interchange and enjoin all construction on Hidden Peak. As to the Mineral Basin, this court ruled that construction in the Mineral Basin area could continue, so long as there was "no surface disturbance of the mineral sliver underlying the lift cable." Because Snowbird stipulated it would not begin construction on the Hidden Park building during the pendency of this appeal, we enjoined construction on that facility. The court also granted Snowbird's request for an expedited appeal.

## C. *Standard of Review*

■ We apply "a deferential standard" when reviewing the Forest Service's actions, reversing only if its actions are "arbitrary, capricious, otherwise not in accordance with the law, or not supported by substantial evidence." *Hoyl v. Babbitt,* 129 F.3d 1377, 1382 (10th Cir.1997); *Citizens to Preserve Overton Park, Inc. v. Volpe,* 401 U.S. 402, 415, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). We give no deference, however, to the district court's decision, which we review de novo. *Webb v. Hodel,* 878 F.2d 1252, 1254 (10th Cir.1989).

## II. *The Interchange*

SOC challenges the Forest Service's handling of the Interchange on a number of grounds. First, SOC alleges that the Forest Service acted arbitrarily and capriciously by concluding that the Interchange qualified for a "categorical exclusion" exempting NEPA review. In particular, SOC contends that the Forest Service 1) failed to adequately explain its basis for subjecting the Interchange to a categorical exclusion and 2) misapplied the categorical exclusion it invoked. Second, SOC asserts that the Forest Service did not adequately notify interested and affected parties before implementing the Interchange. Finally, SOC argues that the Interchange was arbitrary and capricious because the land received by the Forest Service in the exchange was not approximately equal to the land it gave up. The district court rejected all of SOC's claims, and we affirm.

### A. *Categorical Exclusion*

#### 1. *NEPA Overview*

Before turning to SOC's categorical exclusion argument, it is important to understand, generally speaking, the role categorical exclusions play in the larger NEPA framework.

■ The Supreme Court has noted that the National Environmental Policy Act has "twin aims." *Baltimore Gas & Elec. Co. v. Natural Resources Defense Council,* 462 U.S. 87, 97, 103 S.Ct. 2246, 76 L.Ed.2d 437 (1983). First, NEPA forces government agencies to "consider every significant aspect of the environmental impact of a proposed action." *Id.* (internal quotation marks omitted). Second, NEPA mandates that government agencies inform the public of the potential environmental impacts of proposed actions and explain how their decisions address those impacts. *Id.; see also Robertson v. Methow Valley Citizens*

*Council,* 490 U.S. 332, 348, 109 S.Ct. 1835, 104 L.Ed.2d 351 (1989) (observing that NEPA "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision").

■ This circuit and the Supreme Court have repeatedly emphasized, however, that NEPA does not mandate any particular substantive outcome. *See Robertson,* 490 U.S. at 350, 109 S.Ct. 1835; *Custer County Action Ass'n v. Garvey,* 256 F.3d 1024, 1034 (10th Cir.2001); *Comm. to Preserve Boomer Lake Park v. Dep't of Transp.,* 4 F.3d 1543, 1554 (10th Cir.1993). As we recently observed, "[NEPA] does not require agencies to elevate environmental concerns over other appropriate considerations … it requires only that the agency take a 'hard look' at the environmental consequences before taking a major action." *Utah Shared Access Alliance v. United States Forest Serv.,* 288 F.3d 1205, 1207 (10th Cir.2002); *see also Friends of the Bow v. Thompson,* 124 F.3d 1210, 1213 (10th Cir.1997) (discussing hard look requirement).

■ When a government agency prepares to take an action "significantly affecting the quality of the human environment," this "hard look" at potential environmental impacts is accomplished through an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1502.4. An EIS is a detailed document that identifies the potential impacts a proposal may have on the environment. *Friends of the Bow,* 124 F.3d at 1213. Within the EIS, the government agency must discuss the purpose and need for the proposed action, environmental impacts resulting from the actions, unavoidable adverse environmental impacts, alternatives to the proposed action, the relationship between short-term uses and long-term productivity,

and the amount of resources that must be devoted to the proposed action. 42 U.S.C. § 4332(2)(C)(i)-(v); 40 C.F.R. § 1502.10.

The preparation of an EIS occurs in several stages. Initially, an agency announces its intent to study a proposed action through a process called scoping, during which the agency solicits comments and input from the public and other state and federal agencies with the goal of identifying specific issues to be addressed and studied. 40 C.F.R. § 1501.7. After assessing the input from the scoping process, the government then prepares a draft Environmental Impact Statement (DEIS), *id.* § 1502.9(a), which is then presented to the public and other government agencies for notice and comment. *Id.* § 1503.1(a). After evaluating the feedback received during the notice and comment process, the agency prepares a FEIS. *Id.* § 1502.9(b). If after preparing either a DEIS or FEIS, the proposed action substantially changes in a way "relevant to environmental concerns," or if new information comes to light about environmental impacts, an agency must prepare a supplemental EIS (SEIS). *Id.* § 1502.9(c)(1).

Prior to deciding to prepare an EIS, however, an agency may prepare a less detailed document called an Environmental Assessment (EA). *See id.* § 1508.9. An EA is used by an agency to decide "whether to prepare an environmental impact statement or a finding of no significant impact." *Id.* 1508.9(a)(1). If, after completing an EA, an agency properly determines that a proposed project will not significantly impact the human environment, then the government agency issues a finding of no significant impact (FONSI) and the action may proceed, subject to administrative and judicial review. *See Friends of the Bow,* 124 F.3d at 1214; *Comm. to Preserve Boomer Lake,* 4 F.3d

at 1554; *see also Presidio Golf Club v. Nat'l Park Serv.*, 155 F.3d 1153, 1160 (9th Cir.1998) (describing the interaction between an EIS, EA, and FONSI.)

In certain circumstances, however, an agency need not follow the detailed NEPA procedures described above. Under regulations promulgated by the Council on Environmental Quality (CEQ), an agency is not required to prepare either an EIS or EA if the proposed action does not "individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. By and large, the federal regulations delegate to individual agencies the responsibility for defining what type of actions may be categorically excluded from NEPA review.[7] *See* 40 C.F.R. § 1507.3(b)(2)(ii) (requiring agencies to set "[s]pecific criteria" for what actions "normally do not require either an environmental impact statement or an environmental assessment"); *West v. Sec'y. of the Dep't. of Transp.*, 206 F.3d 920, 927 (9th Cir. 2000); *Rhodes v. Johnson*, 153 F.3d 785, 788–89 (7th Cir.1998).

■ Once an agency establishes categorical exclusions, its decision to classify a proposed action as falling within a particular categorical exclusion will be set aside only if a court determines that the decision was arbitrary and capricious. *Friends of Richards–Gebaur v. Fed. Aviation Admin.*, 251 F.3d 1178, 1187 (8th Cir.2001); *Alaska Ctr. for the Env't. v. United States*, 189 F.3d 851, 857 (9th Cir.1999); *Bicycle*

*Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir.1996). When reviewing an agency's interpretation and application of its categorical exclusions under the arbitrary and capricious standard, courts are deferential.[8] *Alaska Ctr.*, 189 F.3d at 857 ("We agree [with the Fourth and Fifth Circuits] that an agency's interpretation of the meaning of its own categorical exclusion should be given controlling weight unless plainly erroneous or inconsistent with the terms uses in the regulations."); *Rhodes*, 153 F.3d at 789 (characterizing the "Forest Service's interpretation of its own implementing procedures [for categorical exclusions] as Forest Service regulations" entitled to "substantial deference"); *W. Houston Air Comm. v. Fed. Aviation Admin.*, 784 F.2d 702, 705 (5th Cir.1986); *City of Alexandria v. Fed. Highway Admin.*, 756 F.2d 1014, 1020 (4th Cir.1985) ("So long as no project required to be included under the statute is excluded under the regulations, we should defer to the agency's interpretation of its own regulations.").

### 2. *"Essentially The Same" Categorical Exclusion*

■ In this case, the Forest Service, pursuant to its authority under 40 C.F.R. § 1507.3(b)(2)(ii), concluded that the Interchange fell within a categorical exclusion exempting land exchanges from NEPA review "where resulting land uses remain

---

7. It is worth noting, however, that CEQ regulations require that agencies "provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4; *Southwest Centr. for Biological Diversity v. U.S. Forest Serv.*, 100 F.3d 1443, 1446 (9th Cir.1996).

8. Courts have treated categorical exclusions under the Forest Service Handbook (FSH) as agency regulations because the categorical ex-

clusions "are published in the Federal Register, and [are] subject to public comment and review." *Rhodes*, 153 F.3d at 788 (citation omitted). Indeed, CEQ regulations specifically require that the categorical exclusion criteria be published in the Federal Register. *See* 40 C.F.R. § 1507.3(a), (b)(2)(ii) (explaining that categorical exclusions should be published in the Federal Register); 57 Fed. Regulation. 43,180, 43,207–43,210 (Sep. 18, 1992) (publishing FSH categorical exclusions).

essentially the same." Forest Service Handbook (FSH) 1909.15 § 31.1b(7). SOC first challenges the Forest Service's decision to invoke this categorical exclusion on the grounds that the agency did not explain its basis for concluding that the Interchange fell within the "essentially the same" category. The record, however, suggests that the Forest Service did issue a decision memo in this case explaining its actions, and, in any event, the record explains the Forest Service's reasoning in concluding that the interchanged land was essentially the same and thus qualified for the categorical exclusion. We find no merit to SOC's argument in this regard.

■ SOC also contends that the administrative record fails to support the Forest Service's decision to classify the Interchange as falling within the "essentially the same" categorical exclusion. According to SOC, prior to the Interchange, the government's lands were relatively undeveloped. Following the Interchange, however, the federal lands were incorporated into a bustling and burgeoning ski resort, SOC argues.[9]

In deciding to go forward with the Interchange, however, the Forest Service rejected this "development" argument, and its reason for doing so is sufficiently supported by the record to prevent reversal under an arbitrary and capricious standard of review. It noted that the existing federal lands were already subject to skiing activity, and, therefore, transferring ownership to Snowbird would not alter its essential use or character. Indeed, according to the Forest Service's assessment, "Prior to the interchange, the feder-

al parcels were undeveloped and proposed to remain undeveloped after the interchange ... Backcountry skiers have used Mineral Basin for years." The Forest Service also noted that, regardless of whether the Interchange occurred, Snowbird intended to develop the surrounding Mineral Basin properties, which constituted the vast majority of land in the Basin and which already engulfed the federal tracts subject to the Interchange. Consequently, irrespective of whether the Interchange transpired, the federal lands would be surrounded by development. Given these facts, we cannot conclude that the Forest Service acted arbitrarily or capriciously when it concluded that activity on the federal lands exchanged in the Interchange would remain "essentially" the same.

### B. Notice of Interchange

■ SOC devotes a substantial portion of its brief to challenging the notice the Forest Service provided to the public and interested parties once it decided to implement the Interchange. SOC correctly points out that, under applicable regulations, "If a proposed action has been categorically excluded from documentation in an EIS or an EA ... [,] interested and affected persons must be informed in an appropriate manner of the decision to proceed with the proposed action." FSH 1909.15 § 32.1. We find SOC's claim that these guidelines were violated unconvincing.

SOC invokes a number of different arguments to challenge the notice provided by the Forest Service.[10] First, SOC points

---

9. To bolster this argument, SOC references an exhibit, appended to its opening brief on appeal, containing a letter addressed to "Forest Supervisors," which explains that land uses cannot be considered "essentially the same"

"where federal tract land will likely be developed."

10. SOC begins its argument by claiming that the Interchange was a major federal action that was not eligible for a categorical exclu-

out that the Forest Service and Snowbird never revealed the pending interchange, even while soliciting comments on the MDP and preparing the extensive DEIS. SOC further alleges that, according to public statements in the DEIS, only private land would be impacted by the towers and lines between the towers for Mineral Lifts A and B, when, in fact, a portion of the lines would span over land transferred to Snowbird by the federal government as part of the Interchange.[11] Moreover, by not informing interested parties, SOC contends the Forest Service violated existing FSH guidelines.

To the extent SOC claims it did not receive notice of the Interchange either before or after it was formally implemented, its argument is undercut by the record, which strongly suggests that SOC learned that the Forest Service was considering the Interchange during the July 6, 1998 meeting between Snowbird and representatives from the SOC and the Sierra Club. A letter from a Snowbird official to a Forest Service supervisor describing what occurred at the meeting, for example, explains that one of the "primary" reasons the meeting was held was to "inform SOC about the land exchange of mineral fractions" and notes a "considerable amount of time was taken to detail the location and acreage of the mineral fractions ... in Mineral Basin."[12] In addition, it is undis-

puted that once the Forest Service formally decided to implement the Interchange, the Forest Service mailed a copy of its decision to an officer of SOC. Although SOC now asserts that the officer did not actually receive the copy because he moved, there is no evidence in the record suggesting that SOC informed the Forest Service of the officer's new address or that the letter was returned to the Forest Service. Yet even if these steps were not adequate to apprise SOC of the action, the record demonstrates that SOC learned, in fact, of the Interchange and protested the action. (*See* Letter from SOC to Jack Craven, United States Forest Service Director of Lands, dated Nov. 4, 1999.) Under these circumstances, we do not believe that SOC has shown that it has suffered any injury from the alleged lack of notice about the Interchange, and we cannot conclude that the notice provided to SOC was arbitrary or capricious under the FSH guideline, to which we give considerable deference.

Having received notice of and protested the Interchange, SOC's argument essentially amounts to a claim that other interested members of the public did not receive notice. SOC, for instance, devotes a large portion of its argument to contending that the Forest Service failed to inform the "general public of the land exchange" during the DEIS process and did not make

---

sion and that required disclosure under NEPA. Because, however, the Forest Service did not act arbitrarily or capriciously by concluding that the interchanged land fell within a categorical exclusion, this line of argument is closed.

11. However, the towers and their accompanying construction would remain entirely on private land.

12. SOC claims that this meeting could not possibly be adequate notice because Snowbird officials, as opposed to Forest Service personnel, conducted the meeting. As dis-

cussed above, the FSH procedures require that "interested and affected persons must be informed in an appropriate manner of the decision to proceed with the proposed action." FSH 1909.15 § 32.1. The regulation does not define how parties should be informed or who should do the informing. In light of the deference we give to agencies' interpretations of their categorical exclusion categories, *see Alaska Ctr.,* 189 F.3d at 857; *Rhodes,* 153 F.3d at 789, we cannot conclude that this Snowbird-led meeting was inadequate.

a general public announcement of the Interchange after deciding to implement the decision. We have explained, however, that the doctrine of prudential standing requires that even a plaintiff who meets the constitutional requirements for standing must also assert "its own rights, rather than those belonging to third parties." *Sac, Fox Nation v. Pierce*, 213 F.3d 566, 573 (10th Cir.2000) (citing *Warth v. Seldin*, 422 U.S. 490, 499, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)). Moreover, a plaintiff cannot assert "a 'generalized grievance' shared in substantially equal measure by all or a large class of citizens." *Warth*, 422 U.S. at 499, 95 S.Ct. 2197.

■ Here, SOC's generalized claims that the Forest Service failed to provide adequate notice to the public appear to fall below the prudential standing threshold. *See Martin v. Occupational Safety & Health Review Comm'n*, 941 F.2d 1051, 1058 (10th Cir.1991) ("CF & I's advance notice of the Secretary's interpretation is fatal to its due process claim because CF & I lacks standing to challenge the regulation on behalf of others without notice."). Even assuming that SOC could overcome the constitutional and prudential standing obstacles facing this argument, it would lose on the merits, for the record demonstrates that "interested and affected parties," such as adjacent landowners and state and local officials, were notified in advance that the Forest Service was considering implementing the Interchange and asked to comment on the proposal. Further, after the Forest Service decided to implement the Interchange, these same individuals received a copy of a decision memo approving the Interchange. In light of these actions, we cannot conclude that the Forest Service acted in an arbitrary or capricious manner.

## C. *Value of Interchanged Lands*

■ Finally, SOC claims that, regardless of whether the Forest Service complied with the categorical exclusion requirements, the Forest Service acted arbitrarily and capriciously in authorizing the Interchange because it relied on inaccurate data when approximating the value of the mineral fractions it transferred to Snowbird. Specifically, SOC alleges that the Forest Service relied upon inaccurate survey data that estimated the Forest Service was only exchanging 1.98 acres of land, when, in reality, SOC argues, a survey by Snowbird indicated that the Forest Service was exchanging 9.39 acres of "developable land" for 6.71 acres of land. In addition, SOC argues that the land received by the Forest Service in the Interchange was a "dump" and unsafe for public use. We find SOC's claims unavailing.

The Small Tracts Act authorizes the federal government to interchange National Forest System land with a private party, as long as the interchanged lands are "of approximately equal value." 16 U.S.C. § 521d. As federal regulations explain, one of the purposes of allowing the interchange of mineral fractions—the type of land at issue in this case—is to allow the government to "resolve land disputes and management problems" associated with federal lands. 36 C.F.R. § 254.30. When deciding whether mineral fractions may be interchanged, the federal regulations require the Forest Service to engage in a two-step process. The Service must first determine that the mineral fractions have specific characteristics allowing them to be interchanged. In order to qualify for an interchange, the Forest Service must conclude that the land "[c]annot be efficiently administered because of size, shape, or location," that the land is or could be occu-

pied by adjoining land owners, and that if sold "separately or aggregated in one transaction," the land "do[es] not exceed 40 acres." *Id.* § 254.34(a)(1)-(3).

Once it is established that the mineral fractions may be conveyed, the Forest Service must examine three criteria to decide if the land *should* be conveyed. First, the Forest Service must consider whether the "mineral fractions are interspersed among and are more or less an integral part of private land holdings." *Id.* § 254.34(b)(1). Second, the Forest Service must consider whether it would be too costly to survey the property in order to develop an effective management plan. *Id.* § 254.34(b)(2). And third, the Forest Service must examine how the parcels to be interchanged will affect the land within which they are interspersed. *Id.* § 254.34(b)(3). Any land that is interchanged cannot exceed $150,000 in value, and all interchanges must be in the "public interest." *Id.* § 254.35(c),(e).

Federal regulations also offer guidance at to what constitutes "approximately equal value" in an interchange. *Id.* § 254.42. As defined by the relevant regulation, "Approximately equal value is a comparative estimate of value of lands involved in an interchange where elements of value, such as physical characteristics and other amenities, are readily apparent and substantially similar." *Id.* § 254.31. The regulations indicate that the Forest Service should consider the "size, shape, location, physical attributes, functional utility, proximity of other similar sites, and amenities in the immediate environs." *Id.* § 254.42. However, because interchanges usually involve land that is relatively small in size, interchanges do not require "a formal appraisal." *Id.* § 254.31. Considering these regulations in light of the Interchange at issue in this case, we cannot conclude that the Forest Service's determination that the exchanged lands were of approximately equal value was arbitrary or capricious.

To the extent SOC attacks the surveys the Forest Service relied upon in determining "approximately equal value," its argument ignores the general rule that courts defer to "the expertise and discretion of the agency to determine proper testing methods." *Sierra Club v. United States Dep't. of Transp.,* 753 F.2d 120, 128 (D.C.Cir.1985); *see also Custer County Action Ass'n,* 256 F.3d at 1036 (noting that the "the mere presence of contradictory evidence does not invalidate" an agency determination) (internal quotation marks omitted); *Inland Empire Pub. Lands Council v. Schultz,* 992 F.2d 977, 981 (9th Cir.1993) (noting that NEPA does not require a court to resolve disputes among competing scientific schools).

Moreover, the record in this case does not support the claim that the Forest Service acted arbitrarily or capriciously in conducting the Interchange. For instance, the Forest Service's Decision Memo concerning the Interchange recognized that discrepancies existed over the exact size and shape of the parcels at issue. The record also demonstrates that the Forest Service knew Snowbird's survey estimated that the federal mineral fractions were substantially larger than surveys conducted by the Bureau of Land Management, but reasoned that the "cost of doing a field survey would far exceed the value of the mineral fractions and in some ways defeat the Small Tracts Act with regard to mineral fractions." At the same time, however, it recognized that it could not rely upon Snowbird's survey, as that survey was not considered "official." *See* 36 C.F.R. § 254.43 (setting standards for surveys Forest Service may use). To remedy this problem, the Forest Service chose to interchange all the mineral fractions surrounded by Snowbird, a process that is appar-

ently relatively common where mineral fractions are involved. The alternative, explained Forest Service officials, would be too costly, especially because the mineral fractions in dispute "[were] small, mostly located on steep terrain and surrounded by private lands, and largely inaccessible to the public." Given that SOC does not contest that the mineral fractions at issue were worth less than $150,000 and difficult to manage, and given that the Forest Service was aware that it could be interchanging as much as nine acres of land, the Forest Service's actions cannot be considered arbitrary or capricious.

■ SOC's additional claim that the Interchange did not involve land of approximately equal value because the property received by the government was a "dump" and "dangerous" simply overstates the record. The documents cited by SOC—a 1992 study reveal that the "dangerous condition"-a mining shaft—was closing in on itself and would likely be closed within one to two years. The "debris" referenced by SOC likely came, again according to the document Snowbird cites, from a mining camp that closed in the early 1900s, and this debris was labeled as having potential "cultural interest." In addition, the same study suggested that the property was being used for recreational and hunting activities and found no hazardous materials on the site.

When these facts are combined with the Forest Service's conclusion that the land received by the Forest Service "adjoins other public land and is of a size, shape, and location which would facilitate public use of this and surrounding National Forest System lands," we do not find that the

Forest Service acted arbitrarily or capriciously.

Accordingly, for all the foregoing reasons, we reject SOC's challenges to the Forest Service's decision to implement the Interchange.

### III. *Interchange and the MDP*

■ SOC contends the Forest Service violated NEPA because the Interchange and the proposals outlined in the MDP were "connected actions" that should have been considered in a common EIS.

CEQ regulations require that "connected" or "closely related" actions "be discussed in the same impact statement." 40 C.F.R. § 1508.25(a)(1). One of the primary reasons for requiring an agency to evaluate "connected actions" in a single EIS is to prevent agencies from minimizing the potential environmental consequences of a proposed action (and thus short-circuiting NEPA review) by segmenting or isolating an individual action that, by itself, may not have a significant environmental impact.[13] *See Wetlands Action Network v. United States Army Corps of Eng'rs*, 222 F.3d 1105, 1108 (9th Cir. 2000); *Northwest Res. Info. Ctr., Inc. v. Nat'l. Marine Fisheries Serv.*, 56 F.3d 1060, 1068 (9th Cir.1995); *see also Hirt v. Richardson*, 127 F.Supp.2d 833, 842 (W.D.Mich.1999) (discussing how the "connected action" regulation is one part of a larger " 'impermissible segmentation' rule"); David R. Mandelker, *NEPA Law and Litigation* § 9.04(2) (West 2001) (discussing how the connected action regulation addresses segmentation problems).

**13.** Though CEQ regulations only explicitly apply the connected action standard to the EIS context, courts and commentators suggest the rule also applies in the EA context. *See, e.g., Wetlands Action Network v. United States*

*Army Corps of Eng'rs*, 222 F.3d 1105, 1118 (9th Cir.2000); Thomas F.P. Sullivan, ed. emeritus, *Environmental Law Handbook* 510 (16th ed., Government Institutes 2001).

Under the applicable regulations, an action will be considered "connected" or "closely related" with other actions in three situations: 1) the action automatically triggers another action requiring an environmental impact statement; 2) the action "cannot or will not proceed unless other actions are taken previously or simultaneously;" or 3) the action is an "interdependent part[ ]" of a larger action and depends on that larger action for its justification.[14] 40 C.F.R. § 1508.25(a)(1)(i)-(iii); *see* Thomas F.P. Sullivan, ed. emeritus, *Envt'l Law Handbook* 510 (16th ed., Government Institutes 2001).

Often, courts find two proposed actions connected where one action could not occur but for the occurrence of the other. *Compare, e.g., Thomas v. Peterson,* 753 F.2d 754, 758 (9th Cir.1985) (finding sale of timber and construction of road necessary to access the timber to be connected actions requiring a single EIS) *with Northwest Res. Info. Ctr.,* 56 F.3d at 1069 (finding transportation and flow improvement plans could exist without one another). By contrast, we recently explained that, "[p]ut simply, projects that have independent utility are not connected actions under 40 C.F.R. § 1508.25(a)(1)(iii)." *Custer County Action Ass'n,* 256 F.3d at 1037 (internal quotation marks omitted); *see also Wetlands Action Network,* 222 F.3d at 1118 ("[W]e have rejected claims that actions were connected when each of the two projects would have taken place with or without the other and thus had independent utility." (internal quotation marks omitted)); *South Carolina v. O'Leary,* 64 F.3d

892, 899 (4th Cir.1995) (holding that actions are not "connected" when they are "independent and separable").

In this case, the record indicates that the MDP and the Interchange were sufficiently independent that they cannot be considered connected actions. According to the record, "only a negligible portion of the land [in the Mineral Basin] is in the National Forest System." The record suggests that Snowbird, with interest in the overwhelming majority of Mineral Basin land, would have developed this area regardless of whether the Interchange occurred. Had the Interchange not occurred, for example, Snowbird could have simply shifted the alignment of Mineral Lifts A and B to avoid crossing over the federal lands.

Similarly, according to the record, the "scattered nature and small size" of mineral fractions meant that the "alignment of the lifts and roads could avoid any federal parcels." Moreover, the record suggests that "the need and the appropriateness of the interchange [was] not dependent on what Snowbird plan[ned] to do with the private property because the scattered mineral fractions were difficult and impractical to manage." Indeed, the Forest Service indicated in the administrative record that it "would have entertained other possibilities to interchange these fractions had any been proposed."

Consequently, on the record before us, the Interchange and the MDP do not satisfy the regulatory definition for "connected" actions.[15]

---

14. CEQ regulations also suggest that an agency should consider similar actions in a common environmental study when they "have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography." 40 C.F.R. § 1508.25(a)(3).

15. SOC appears also to be making an argument that the Forest Service improperly segmented the Interchange from the rest of the MDP. However, its "improper segmentation" argument is conclusory and very brief, consisting of a single three line paragraph in its opening brief and a blended argument in its

## IV. Consideration of Alternatives

SOC also challenges that Forest Service's EIS for not considering an appropriate number of alternatives when evaluating Snowbird's proposal for erecting a new Hidden Peak facility. SOC attacks the Forest Service's actions through a two-prong argument. First, SOC contends that the Forest Service inappropriately read the EIS's statement of purpose as focusing exclusively upon building a structure on Hidden Peak. Second, having made this error, SOC alleges, the Forest Service then failed to evaluate the possibility of building a smaller structure on Hidden Peak or, alternatively, placing facilities off peak. We disagree.

### A. Standards

One of the key provisions of NEPA and its corresponding regulations is that government agencies must "include in every recommendation or report on proposals" detailed statements analyzing "alternatives to the proposed action." 42 U.S.C. § 4332(c)(iii). According to CEQ regulations, considering alternative actions "is the heart of the environmental impact statement." 40 C.F.R. § 1502.14; see also All Indian Pueblo Council v. United States, 975 F.2d 1437, 1444 (10th Cir.1992). As a result, agencies must "[r]igorously explore and objectively evaluate all reasonable alternatives." 40 C.F.R. § 1502.14. "To comply with the National Environmental Policy Act and its implementing regulations, [agencies] are required to rigorously explore all reasonable alternatives ... and give each alternative substantial treatment in the environmental impact statement." Custer County Action Ass'n, 256 F.3d at 1039; see also Colo. Envtl. Coalition v. Dombeck, 185 F.3d 1162, 1174

(10th Cir.1999) (explaining reasonable alternatives). Not only must an agency "rigorously explore and objectively evaluate all reasonable alternatives," agencies must also "briefly discuss the reasons" for having eliminated other alternatives. 40 C.F.R. § 1502.14(a).

As court opinions and the CEQ regulations make clear, however, an agency is only required to consider "reasonable alternatives." Id. § 1502.14. In determining whether an agency considered reasonable alternatives, courts look closely at the objectives identified in an EIS's purpose and needs statement. See Colo. Envtl. Coalition, 185 F.3d at 1174–75. Where the action subject to NEPA review is triggered by a proposal or application from a private party, it is appropriate for the agency to give substantial weight to the goals and objectives of that private actor. See City of Grapevine v. Dep't of Transp., 17 F.3d 1502, 1506 (D.C.Cir.1994); La. Wildlife Fed'n, Inc. v. York, 761 F.2d 1044, 1048 (5th Cir.1985). Nevertheless, courts will not allow an agency to define the objectives so narrowly as to preclude a reasonable consideration of alternatives. Davis v. Mineta, 302 F.3d 1104 (10th Cir. 2002) (holding that a statement of objectives would be unreasonably narrow if it would permit only one particular crossing across a river in order to improve traffic flow).

Once an agency appropriately defines the objectives of an action, "NEPA does not require agencies to analyze 'the environmental consequences of alternatives it has in good faith rejected as too remote, speculative, or ... impractical or ineffective.'" All Indian Pueblo Council, 975 F.2d at 1444 (quoting City of Aurora

---

reply brief. Although there are differences between a "connected action" argument and a "segmentation" argument, for many of the same reasons already expressed, we find the segmentation argument to be without merit.

*v. Hunt,* 749 F.2d 1457, 1467 (10th Cir. 1984)). Instead, we apply a "rule of reason test" that asks whether "the environmental impact statement contained sufficient discussion of the relevant issues and opposing viewpoints to enable the Forest Service to take a hard look at the environmental impacts of the proposed expansion and its alternatives." *Colo. Envtl. Coalition,* 185 F.3d at 1174. Alternatives that "do not accomplish the purpose of an action are not reasonable" and need not be studied in detail by the agency. *Custer County Action Ass'n,* 256 F.3d at 1041.

## B. *Alternatives*

In this case, SOC does not directly challenge the Forest Service's stated objectives in evaluating Snowbird's overall master development plan, which included upgrading or replacing outdated facilities, improving circulation throughout the resort, balancing and making more efficient terrain use, and maintaining a "vigorous forest" and "quality recreational experience."

Rather, SOC argues that the Forest Service inappropriately restricted the range of alternatives it considered by not fully exploring alternatives that could have accomplished these goals without requiring a large structure on Hidden Peak. All the Forest Service proposals, SOC contends, contained "colossal structure[s]" that would dwarf the existing Hidden Peak structures and obstruct the view of Hidden Peak.

The Forest Service, however, considered alternatives that had differences in size spanning over 56,000 square feet. Besides the no-action alternative, which would have left the smaller existing structures in place with minor alterations, it considered a 22,000 square foot structure, Snowbird's proposal for a 78,000 square foot building, and the preferred alternative, which called for a structure ranging between 22,000 square feet and 50,000 square feet.

■ Contrary to SOC's claim, the Forest Service did not breach the "rule of reason" by refusing to study in detail alternatives that would have limited the structure's size to between 1,600 square feet and 22,000 square feet or moved the structure off-peak altogether. *See Colo. Envtl. Coalition,* 185 F.3d at 1174. As the record illustrates, proposals calling for smaller structures on Hidden Peak, or removing the Hidden Peak structure to another location altogether, were impractical and failed to satisfy the objectives of the project, which, again, were to improve the recreational use in the area while balancing environmental interests. *See Custer County Action Ass'n,* 256 F.3d at 1041. Evidence in the record suggests, for example, that moving the structure to nearby resort areas could have interfered with site-specific plans governing those regions, and that developing another resort would have undercut the investment at Snowbird already made by the Forest Service. According to documents in the record, locating skier services at the base of the resort or in the mid-mountain region, as opposed to the mountain's peak, would not have improved skier circulation, particularly because Hidden Peak is at the center of activity on the mountain and feeds Snowbird's three primary skiing areas, nor would it have met the need to respond to user desires, nor were there available feasible alternative locations. Finally, there is some suggestion in the record that placing the structure at the base of the mountain or in the mid-mountain region could create additional negative visual impacts.

Likewise, building a structure underground (so as to avoid impairing the ridge line altogether), the Forest Service noted in its analysis, would generate substantially greater adverse environmental effects

than any of the proposed alternatives, and was not regarded as technologically or economically feasible. The Service also reasoned that by building on a site where structures already exist, it could minimize environmental impacts in other regions. Indeed, even in its filings before the district court, SOC appeared to recognize that placing a structure on Hidden Peak was not, per se, objectionable. SOC emphasized, for example, that it was fully prepared to accept a 7,000 square foot structure on the Peak.

Additionally, the Forest Service concluded that anything smaller than 22,000 square foot structure would not "meet skier needs," thereby negating the proposal's goal of increasing efficiency and recreational balance in the area. Having reviewed the record, we cannot conclude that the Forest Service's finding on this score was arbitrary or capricious. *See Hells Canyon Alliance v. United States Forest Serv.*, 227 F.3d 1170, 1181 & n. 13 (9th Cir.2000); *Colo. Envtl. Coalition*, 185 F.3d at 1175.

Nor did the Forest Service's consideration of the various alternative structures ignore, as the SOC's argument at times implies, the impact that placing a structure on Hidden Peak would have upon views of the mountain. As maps in the record demonstrate, the Service analyzed in detail how the proposed structures, including the no-action alternative, which would have left the existing structures on the mountain, would have affected the views of Hidden Peak. The Forest Service concluded that the building proposed in the preferred alternative, even though much larger than the existing structures on Hidden Peak, could blend in better with Hidden Peak's ridge line and "could potentially improve

the visual impact of the peak." Given that the existing box-shaped structure, which was constructed in 1971, simply sits atop Hidden Peak, while the proposed structure, though larger, would be rounded to blend in with the contour of the Peak, we cannot find the Forest Service's conclusion arbitrary or capricious. *Custer County Action Ass'n*, 256 F.3d at 1029–30.

Accordingly, we reject SOC's claims that Forest Service considered an impermissible range of alternatives.

## V. *Amendment to the Forest Plan*

Finally, SOC challenges the Forest Service's decision to amend the Wasatch–Cache Forest Plan to allow for the construction of a structure on Hidden Peak.[16] Specifically, SOC contends that the Forest Service did not give adequate notice to the public in amending the Forest Plan. SOC further argues that the Forest Service ignored or misapplied relevant factors when characterizing its proposed amendment as nonsignificant. We disagree.

### A. *Procedures*

NFMA provides that once enacted, forest plans may "be amended in any manner whatsoever." 16 U.S.C. § 1604(f)(4). If an amendment to a forest plan would be "significant," however, then NFMA mandates substantial public involvement, planning, and input, requiring, in essence, the Forest Service "to conduct the same complex planning process applicable to promulgation of the original plan." *Sierra Club v. Cargill*, 11 F.3d 1545, 1551 (10th Cir.1993) (Seymour, J., dissenting); *see* 36 C.F.R. § 219.10(f). Among other things, for significant amendments, NFMA requires the Forest Service to "mak[e] plans

16. All sides concede that erecting any of the proposed alternatives on Hidden Peak violates existing visual quality objectives.

or revisions available to the public at convenient locations in the vicinity of the affected unit for a period of at least three months before final adoption." 16 U.S.C. § 1604(d).

Neither NFMA, nor its accompanying regulations, specify what constitutes a "significant" amendment to a forest plan. *See Cargill,* 11 F.3d at 1548 (noting that regulations give "little guidance as to when a change is significant"). Indeed, applicable regulations "expressly commend[ ] the determination of the significance of an amendment to the Forest Supervisor's judgment." *Id.* According to the regulations, "Based on an analysis of the objectives, guidelines, and other contents of the forest plan, the *Forest Supervisor shall determine* whether a proposed amendment would result in a significant change in the plan." 36 C.F.R. § 219.10(f) (emphasis added). If the Forest Supervisor concludes that an amendment is nonsignificant, "[he] may implement the amendment following *appropriate public notification* and satisfactory completion of NEPA procedures." *Id.* (emphasis added).

Although the Forest Supervisor has wide discretion in deciding whether an amendment is significant, the FSH outlines factors the Supervisor must consider when assessing the significance of a proposed amendment, including 1) the timing of the proposed change relative to the expiration or next scheduled revision of the Forest Plan (the shorter the remaining life of the plan, the less significant the amendment); 2) "the location and size of the area involved in the change" in comparison to the "overall planning area"; 3) the long-term significance of the project relative to the goals and objectives of the forest plan; and 4) the impact of the

amendment on "management prescription"—whether the change applies only to a specific situation or whether it likely will affect future decisions as well.[17] FSH 1909.12 § 5.32(3)(a)-(d).

 Like the other issues in this case, when reviewing whether an agency properly classified an action as nonsignificant, we will only reverse the agency's classification if it "is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Cargill,* 11 F.3d at 1548.

### B. *Notice*

SOC alleges that the Forest Service breached its duty under NFMA to notify the public before instituting the amendment. Specifically, SOC charges that the Forest Service only gave notice of the amendment "for the first time" in the FEIS and Record of Decision (ROD) announcing the construction of the Hidden Peak structure. SOC asserts that this announcement violated NEPA and NFMA because it denied the public an opportunity to "comment" on the proposed amendment. Additionally, SOC contends that previous allusions to the possibility of amending the Forest Plan were "merely vague references to a potential future action that gave the public no idea of the scope or nature of the purportedly impending Forest Plan amendment." We find SOC's argument unpersuasive.

 SOC is correct in asserting that NFMA requires public notice for any amendment, significant or otherwise. *Forest Guardians v. Thomas,* 967 F.Supp. 1536, 1561 (D.Ariz.1997). It is debatable, however, how "public" this notice must be before the Service implements a *nonsignificant* amendment. SOC is unable to point

---

**17.** Although the FSH states that the four criteria discussed above "are to be used" in deciding if a plan is significant, it states that "[o]ther factors may also be considered, depending on the circumstances." FSH 1909.12 § 5.32(3).

to any specific language either in the FSH, NFMA, or NEPA expressly requiring that the specific language of a nonsignificant amendment be published before the Forest Service implements the amendment. While NFMA speaks in terms of "public notice," 16 U.S.C. § 1604(f)(4), and the regulations speak of "public notification," 36 C.F.R. § 219.10(f), these terms do not, in themselves, necessarily mandate "public comment," and, as discussed when considering categorical exclusions, public comment is not required to satisfy all NEPA procedures.

 We need not resolve, however, the precise contours of the Forest Service's notice obligations in this context, for applying the deferential arbitrary and capricious standard of review, we find that NEPA's disclosures during the DEIS process provided sufficient notice and opportunity for public comment. During this process, for instance, the Forest Service discussed how any structure on Hidden Peak would violate existing Forest Plan guidelines and would require "[a] WCNF Forest Plan amendment to the site's [Visual Quality Objective]." Additionally, even under the no-action alternative, an amendment would be required because the existing Hidden Peak structures violated the Forest Plan's guidelines, the document explained. Moreover, by placing the discussion of the amendment in the DEIS, the Forest Service gave the general public an opportunity to comment on the proposed amendment.[18] See 40 C.F.R. § 1503.1(a) (explaining agencies' duties to invite and to respond to public comments on draft environmental impact statements). Under these circum-

stances, we believe the Forest Service supplied sufficient notice to the public of the proposed amendment.

### C. *Significance of Amendment*

 SOC also argues that the Forest Service did not analyze adequately the factors identified in the FSH as relevant to deciding whether an amendment is significant. It is true, as SOC argues, that the ROD's *explicit* discussion of the amendment's significance was relatively terse:

> We have concluded that this is a nonsignificant amendment to the Forest Plan because the affected area (one small area, about 160 acres, adjacent to Snowbird's permit area and a mountain peak within the current permit area visible from certain viewpoints in the area) is a very limited area in the context of the overall planning area (the WCNF). In addition, the change does not alter the long-term relationship between levels of goods and services projected by the Forest Plan nor change the desired future condition of the land.

SOC's argument mistakenly assumes that the Forest Service's amendment can be found arbitrary and capricious because the ROD did not indicate *expressly* that it was applying the factors outlined in the FSH. As the Seventh Circuit has explained, however, a court reviewing an agency's decision under the arbitrary and capricious standard " 'is to uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned,' " *Bagdonas v. Dep't of Treasury*, 93 F.3d 422, 426 (7th Cir.1996) (quoting *Bowman Transp., Inc.*

---

18. SOC claims that the notice in the DEIS was deficient because no one specifically commented on amending the Forest Plan to allow for a Hidden Peak structure. The Forest Service, however, received extensive comments on the proposals to build a Hidden Peak structure. Given that constructing any

structure on Hidden Peak would require amending the Plan, commentators likely felt that the amendment issue was subsumed by the larger question of what type of structure, if any, should exist on Hidden Peak. Approval of a structure and amendment to the Forest Plan went hand-in-hand.

*v. Arkansas–Best Freight Sys. Inc.*, 419 U.S. 281, 286, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)), and the court concludes " 'that the agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made.' " *Id.* (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Auto. Ins. Co.*, 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962))); *cf. Double J. Land & Cattle Co. v. United States Dep't of Interior*, 91 F.3d 1378, 1383 (10th Cir.1996) ("When an agency makes a decision, the grounds upon which the agency acted must be clearly disclosed in, and sustained by, the record." (internal quotation marks omitted)). Although we will not "supply[ ] a reasoned basis for the agency's action that the agency itself has not given," *Rapp v. United States Dep't of Treasury*, 52 F.3d 1510, 1515 (10th Cir. 1995), the agency's "statement of reasons need not include detailed findings of fact but must inform the court and the petitioner of the grounds of decision and the essential facts upon which the administrative decision was based." *Bagdonas*, 93 F.3d at 426 (internal quotation marks omitted).

Applying this standard of review, we conclude that, although the Forest Service did not explicitly identify the four factors the FSH indicates "are to be used" when determining whether a forest plan amendment is significant, FSH 1909.12 § 5.32(3), a review of the ROD and the administrative record demonstrates that the Forest Service considered the FSH factors when deciding whether to authorize a new building on Hidden Peak and amend the Forest Plan.[19]

As an initial matter, we observe that the Forest Service devoted a significant amount of energy to debating the appropriateness of the Hidden Peak structure and its potential visual impacts. In the ROD, for example, the Forest Service explained that "[t]he Hidden Peak structure was the most difficult aspect" of its review of Snowbird's MDP.

Turning more specifically to the FSH factors, we first note, as SOC concedes in its brief, that the ROD clearly addressed the "location and size," "long-term significance," and "management prescription" factors. The ROD, for example, considered the location and size of the project, observing that although the new structure would be larger than the existing buildings on Hidden Peak, the Forest Service had deliberately reduced the sized of the project to minimize "scenic impact," that the Peak was a small area relative to the larger forest, that the Peak's existing structures already impaired visual quality, and that "modern design concepts and materials [would] maintain if not improve the visual impact of the peak." The ROD also emphasized that *only* the Hidden Peak structure would be exempted from the visual quality requirements and would not "set a precedent for similar development elsewhere," a finding directly related to the "management prescription" factor. Finally, the ROD considered facts relevant to the "plans and objectives" factor, noting that constructing the building would help meet one of the Forest Plan's goals, efficient recreation use.

As SOC points out, the discussion of timing (i.e., the timing of the proposed amendment relative to the expected life of the Forest Plan) is less clear. The ROD, however, noted that "the WCNF Forest

---

**19.** We by no means endorse the Forest Service's failure to identify and apply expressly the four factors that the FSH indicates *"are to* *be used* when determining whether a proposed change to a forest plan is significant."* FSH 1909.12 § 5.32(3) (emphasis added).

Plan was finalized in 1984" and approved in 1985, which suggests that the proposed amendment was fairly far removed from the adoption of the Plan. Moreover, the FEIS, issued in November 1999, a month prior to the ROD, noted that the Forest Service was in the process of revising the underlying Forest Plan and that, rather than amending the existing Plan, any required changes could be "incorporated into the new Forest Plan." "Any Forest Plan amendment or revision," the FEIS further explained, "would be stipulated in the ROD." Thus, under these circumstances, we conclude that the Forest Service adequately considered the FSH timing factor.

Therefore, we reject SOC's contention that the Forest Service did not adequately consider the factors that the FSH indicates should be used when assessing the significance of a forest plan amendment.

### VI. *Conclusion*

The district court's decision is **AFFIRMED** in all respects. Accordingly, we hereby **VACATE** the injunctions imposed pending appeal.