**OREGON NATURAL RESOURCES COUNCIL FUND, et al.,**
Plaintiffs,

v.

**Linda GOODMAN, et al., Defendants.**

No. 04–593–CO.

United States District Court,
D. Oregon.

June 22, 2004.

Christopher G. Winter, Ralph O. Bloemers, James D. Brown, Cascade Resources Advocacy Group, Susan Jane M. Brown, Pacific Environmental Advocacy Center, Portland, OR, for Plaintiffs.

Jeffrey K. Handy, United States Attorney's Office, Portland, OR, for Defendants.

## ORDER

HOGAN, District Judge.

Plaintiffs move for a temporary restraining order and preliminary injunction enjoining the United States Forest Service (the Service) and proposed intervener Crown Pacific from implementing the Toolbox Fire Recovery Project, which includes commercial salvage logging. Plaintiffs allege four violations of the National Forest Management Act (NFMA) and the National Environmental Policy Act (NEPA). As it appears undisputed that the Service awarded the timber sale contract to Crown Pacific, Crown Pacific's motion to intervene is allowed to the extent that Crown Pacific may participate in the remedial phase of this litigation.

### Background

The Toolbox Fire Recovery Project authorizes, among other activities, commercial salvage logging of approximately 36 mmbf on 10,214 acres, construction of 21.5 miles of temporary roads, reconstruction of 4 miles of existing roads, fuels reduction treatments on approximately 16,000 acres, and reforestation planting on approximately 20,000 acres. ROD at 4. The project area encompasses approximately 47,200 acres. *Id.* at 1. The Regional Forester determined that an emergency situation exists for 7,287 acres of commercial salvage and post harvest fuels treatment, and for 4,500 acres of fuels treatment and site preparation outside of commercial salvage areas. *Id.* at 44.

### Discussion

Preliminary equitable relief is appropriate if plaintiffs demonstrate a likelihood of success on the merits and the possibility of irreparable injury, or the existence of serious questions on the merits and a balance of hardships tipping in their favor. *National Wildlife Federation v. Burlington N. Railroad,* 23 F.3d 1508, 1510 (9th Cir.1994). These tests are points on a sliding scale in which the required degree of irreparable harm increases as the probability of success decreases. *United States v. Nutri–cology, Inc.,* 982 F.2d 394, 397 (9th Cir.1992). Irreparable harm is not presumed to flow from a violation of NEPA. *Amoco Production Co. v. Village of Gambell,* 480 U.S. 531, 545, 107 S.Ct. 1396, 94 L.Ed.2d 542 (1987). Nevertheless, owing to the nature of many environmental injuries, the balance of harms in environmental cases often favors issuance of an injunction where a plaintiff proves that harm to the environment is sufficiently likely. *Amoco, supra; National Wildlife Federation,* 23 F.3d at 1510.

Plaintiffs first argue that the Service violated NFMA by failing to ensure viable populations of management indicator species (MIS). Pl's Memo. at 15. Specifically, plaintiffs argue that the Service improperly relied on the management tool "DecAID"[1] to ensure viable populations, because DecAID's authors expressly state that it is not a population viability analysis. The court is likely to ultimately conclude that the Service did not violate NFMA in this regard. The Service appears to have used DecAID to estimate "tolerance levels" for various snag densities and sizes, and to evaluate the effects of alternatives.[2] Based on this analysis, the Service concluded that the selected alternative would ensure viability of MIS

---

1. "DecAID" stands for "decayed wood advisor." According to the Service, DecAID is an advisory tool developed to help wildlife managers evaluate the effects of forest conditions (existing or resulting from proposed activities) on wildlife that use snags and down wood. FEIS 3–151.

2. "Tolerance level" refers to the percentage of a population of a given bird species that will assuredly occupy habitat with certain characteristics. EIS 3–153.

species. This conclusion did not come from DecAID. The court is deferential to an agency's scientific conclusions, such as whether habitat with certain conditions will support viable populations.[3] *See Arizona Cattle Growers' Ass'n v. United States Fish and Wildlife,* 273 F.3d 1229, 1236 (9th Cir.2001). The Service can meet its obligation to ensure viable populations by requiring that the decision area contain sufficient habitat for survival. *Inland Empire Public Lands Council v. U.S. Forest Service,* 88 F.3d 754, 761 (9th Cir.1996).

■ Next, plaintiffs argue that the Service violated snag retention guidelines contained in the Fremont National Forest Land and Resource Management Plan (LRMP), as amended by the "Eastside Screens." Specifically, plaintiffs argue that the Service ignored snag height requirements and impermissibly relied on the average snag density for the project area to conclude that the project exceeded per acre snag density requirements of the LRMP. The court is likely to ultimately conclude that the Service's view that the snag retention guidelines of the LRMP for wildfire areas do not require four snags on every acre in the project area is reasonable. The Eastside Screens amended the LRMP to require that the Service use the best available science through snag retention models. LRMP at 105; Appendix B at 11 (Ex. D to Winters Decl.). Nothing suggests that the Service's view that the best available science indicates that birds prefer to nest and forage in dispersed patches or clumps of snags is unreasonable. EIS at 3–162. The court must defer to the agency. *Marsh v. Oregon Natural Resources Council,* 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989).

■ Next, plaintiffs argue that the Service violated NEPA in failing to seriously consider alternative F, a restoration-only alternative which would have involved small-diameter fuels treatments in high risk areas, limited prescribed fire, limited planting of ponderosa pine seedlings, and a full array of road decommissioning and other soil and water restoration projects. EIS at 2–61–62. The Service declined to give this alternative serious and detailed consideration for the stated reasons that it would not meet project objectives of reducing surface fuel loading, developing forest stands with structural characteristics closer to the historic range of variability (HRV) and providing commercial timber production. *Id.* The Service further noted that the no action alternative (alternative A) provided analysis of the no action components of the approach, and all action alternatives include a full array of restoration activities. FEIS at 2–62. Plaintiffs are not likely to prevail on this claim because it appears that the Service's purpose and need statement of restoring conditions to within the historic range of variability is reasonable, as is the rejection of the alternative for failure to contribute to that objective. The alternative appears inconsistent with the LRMP. EIS at 1–11, Appendix G at 25.

■ Finally, plaintiffs argue that the Service violated NEPA in determining that its adoption in 2003 of regulations exempting projects involving designated emergency situations from the automatic stay ordinarily triggered by the filing of an administrative appeal was not a major federal action obligating the Service to prepare an analysis of effects of the regulations on the human environment. The court is likely to ultimately conclude that the Service did not violate NEPA in this regard. The Service's decision to classify

---

**3.** Plaintiffs raised additional objections to the Service's use of DecAID as a predictor of population viability. The court rejects the objections because it concludes that the Service did not use DecAID to predict population viability.

a proposed action as falling within an existing categorical exclusion may be set aside only if it is arbitrary and capricious. *Citizens Committee to Save Our Canyons v. United States Forest Service,* 297 F.3d 1012, 1023–24 (10th Cir.2002). The amendments do not appear to limit a litigant's right to file suit and do not authorize ground disturbing activities. The court is not prepared to say that the Service arbitrarily concluded that the amendments fall within the Service's categorical exclusion for rules or regulations of administrative procedure. *See* 68 Fed.Reg. 33595.

■ Based on the foregoing, the court concludes that plaintiffs have not demonstrated a significant likelihood of success on the merits of their claims. The degree of harm required to justify preliminary equitable relief is therefore greater than if plaintiffs had made a stronger showing on the merits. Plaintiffs contend that it is well established that timber cutting causes irreparable environmental damage. Plaintiffs point to a scientific paper in support of their contention that "there is considerable evidence that persistent, significant adverse environmental impacts are likely to result from salvage logging ...." including soil compaction and erosion, loss of habitat for cavity nesting species and loss of structurally and functionally important large wood debris. Beschta Report at 6–7 (Ex. C to Winters Decl.). Plaintiffs cite to the same paper for the proposition that fires do not require a rapid human response. *Id.* at 5. Plaintiffs note that the Service expects that implementation of the project will harm snag dependent species, as it will lower tolerance levels for black-backed and Lewis' woodpeckers.[4] *See* EIS

at 3–197. They also argue that the economy can withstand a temporary stay of the project.

The Service estimates that the economic loss that will result from a 105–day delay is close to $600,000 for diminution in value and loss of merchantable timber, and $100,000 to $400,000 for destruction and replacement of seedlings for reforestation. Ex. 105. The Service argues that an injunction would also delay soil and riparian protection and road decommissioning features of the project. Crown Pacific submitted the affidavit of Greer Kelly, who states that persons and families that operate its mill at Gilchrest, Oregon will be adversely economically affected, as will loggers and their families and communities. Crown Pacific and the Service argue that loss of value from decaying timber may render the project economically unsound and thereby preclude a private entity from undertaking the salvage operation that is designed in part to restore the project area to a sustainable condition within the historic range of variability, and to reduce the risk of catastrophic fire.

Considering the evidence and allegations of harm that will result from granting or withholding equitable relief, the interests of the public and plaintiffs' showing on the merits, the court holds that preliminary injunctive relief is not warranted in this case.

### Conclusion

For the foregoing reasons, Crown Pacific's amended motion to intervene [# 37] is granted to the extent that Crown Pacific may participate in the remedial phase of this litigation; Crown Pacific's motion to

---

4. Crown Pacific filed objections to plaintiffs' affidavits evidencing harm to plaintiffs' members from irreparable loss of cavity nesting bird habitat. The grounds for the objections are lack of relevance and foundation and improper opinion testimony. Plaintiffs confirm

that the affidavits are offered only to establish standing, and not as evidence of harm to cavity nesters. Crown Pacific's objections are overruled, and the motion to strike contained within the objections is denied.

strike contained within its objections [# 43] is denied; plaintiffs' motion for a temporary restraining order and preliminary injunction [# 18] is denied.

IT IS SO ORDERED.