LEAGUE OF WILDERNESS DE-FENDERS–BLUE MOUNTAINS BIODIVERSITY PROJECT, an Oregon nonprofit corporation, and Cascadia Wildlands Project, an Oregon nonprofit corporation, Plaintiffs,

v.

UNITED STATES FOREST SERVICE, Defendants.

No. CV 04–982–PK.

United States District Court, D. Oregon.

Aug. 3, 2006.

R. Scott Jerger, Field & Jerger, LLP, Susan Jane M. Brown, Pacific Environmental Advocacy Center, Portland, OR, for Plaintiffs.

John Bennett Munson, U.S. Department of Agriculture, Office of the General Counsel, Stephen J. Odell, United States Attorney's Office, Portland, OR, for Defendant.

## ORDER

MARSH, Senior District Judge.

On June 6, 2006, Magistrate Judge Papak issued a Findings and Recommendation (F & R) that plaintiffs' motion for summary judgment (# 19) should be denied and defendant's cross-motion for summary judgment (# 48) should be granted. Plaintiffs have filed timely objections and the matter is now before me pursuant to 28 U.S.C. § 636(b)(1)(B) and Fed.R.Civ.P. 72(b) on *de novo* review. *See* 28 U.S.C. § 636(b)(1)(C); *Bhan v. NME Hospitals, Inc.*, 929 F.2d 1404, 1415 (9th Cir.1991).

Plaintiffs bring this action under the Administrative Procedure Act (APA), 5 U.S.C. § 706. They allege defendant's Final Supplemental Environmental Impact Statement (FSEIS) regarding the Deep Vegetation Management Project in the Ochoco National Forest and, in particular, defendant's Record of Decision implementing Modified Alternative C of the FSEIS, which would allow commercial logging of 12.8 million board feet of timber on 6,261 acres of forest, failed to comply with the requirements of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4331 *et seq.* Plaintiff's also allege defendant's implementation of Alternative C violates the Ochoco National Forest Land Resource and Management Plan (LMRP), promulgated pursuant to the National Forest Management Act (NFMA), 16 U.S.C. § 1604(a).

Magistrate Judge Papak addressed and rejected each of plaintiffs' contentions in his F & R. Plaintiffs object to the F & R on the grounds that Magistrate Judge Papak afforded too much deference to and essentially "rubber-stamped" defendant's conclusions that it complied with NEPA and the NFMA, erroneously found the administrative record supported defendant's decision to implement Alternative C, and improperly considered materials submitted by defendant even though he stated such materials were not considered.

I have reviewed the record and find Magistrate Judge Papak carefully evaluated the record, addressed plaintiffs' arguments, and made findings and recommendations that are consistent with both the record and the law. I also find the magistrate judge gave appropriate but not undue deference to defendant's expertise. *See Klamath–Siskiyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989, 993 (9th Cir.2004)("Although an agency's actions under NEPA are subject to careful judicial scrutiny, courts must also be mindful to defer to agency expertise, particularly with respect to scientific matters within the purview of the agency.").

Finding no error in the Findings and Recommendation (# 105), I adopt them as my own. Plaintiffs' motion for summary judgment (# 19) is **DENIED**, and defendant's cross-motion for summary judgment (# 48) is **GRANTED**.

IT IS SO ORDERED.

## FINDINGS AND RECOMMENDATION

PAPAK, United States Magistrate Judge.

Plaintiffs challenge the Deep Vegetation Management Project (Deep Project) in the Ochoco National Forest. Plaintiffs allege the U.S. Forest Service (Forest Service) violated the National Forest Management Act (NFMA), 16 U.S.C. §§ 1600 *et seq.*, the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, and the Administrative Procedures Act (APA), 5 U.S.C. §§ 701 *et seq.* This court has jurisdiction under 28 U.S.C. § 1331.

In January, 2004, the Forest Service issued a Final Supplemental Environmental Impact Statement (FSEIS) for the Deep Project. On January 16, 2004, the Forest Service issued the Record of Decision (ROD) implementing modified Alternative C. Plaintiffs timely appealed this decision. On April 27, 2004, the Forest Service denied plaintiffs' administrative appeal such that they have exhausted their administrative remedies. Plaintiffs filed their complaint with this court on July 20, 2004, and moved for summary judgment on February 18, 2005. Defendant filed a cross-motion for summary judgment. Oral argument was held on January 17, 2006, and briefing was complete on April 6, 2006, after the court gave leave to file supplemental briefs on two separate occasions. For the reasons set forth below, this court recommends denying plaintiffs' motion for summary judgment and granting defendant's motion for summary judgment. All outstanding motions to strike are denied as moot.

## LEGAL STANDARD

A party is entitled to summary judgment as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show there is no genuine issue as to any material fact." Fed. R.Civ.P. 56(c); *Bhan v. NME Hosp's, Inc.*, 929 F.2d 1404, 1409 (9th Cir.1991).

■■■ Because NFMA and NEPA do not provide a private cause of action to enforce their provisions, agency decisions allegedly violating NFMA and NEPA are reviewed under the APA, 5 U.S.C. § 706. *Native Ecosystems Council v. U.S. Forest Service*, 428 F.3d 1233, 1238 (9th Cir.2005) (citing *Neighbors of Cuddy Mountain v. Alexander*, 303 F.3d 1059, 1065–1067 (9th Cir.2002)). Under the APA, a court may set aside an agency decision if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The agency's action may not be set aside so long as it has a "rational basis." *Prairie Wood Products v. Glickman*, 971 F.Supp. 457, 462 (D.Or. 1997) (citing *Bowman Transp., Inc. v. Arkansas–Best Freight System, Inc.*, 419 U.S. 281, 290, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974); *Friends of the Earth v. Hintz*, 800 F.2d 822, 831 (9th Cir.1986)).

■■■ Review under this standard is to be searching and careful, but remains narrow, and a court should not substitute its judgment for that of the agency. *Mt. Graham Red Squirrel v. Espy*, 986 F.2d 1568, 1571 (9th Cir.1993) (citing *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 378, 109 S.Ct. 1851, 104 L.Ed.2d 377 (1989)). Deference to an agency's technical expertise and experience is particularly warranted with respect to questions involving scientific matters. *United States v. Alpine Land and Reservoir Co.*, 887 F.2d 207, 213 (9th Cir.1989), *cert. denied*,

498 U.S. 817, 111 S.Ct. 60, 112 L.Ed.2d 35 (1990).

## FACTUAL BACKGROUND

In October 1999, the Forest Service initiated NEPA documentation process and issued a scoping [1] notice for the Deep Project. In April 2001, the Forest Service published a draft environmental impact statement (EIS) and, after receiving comments and making adjustments, issued a final EIS in September 2001. The Forest Service then issued a record of decision (ROD). AR 2534–56.[2] Shortly thereafter plaintiffs filed an administrative appeal of the Deep Project on behalf of a number of environmental organizations including both plaintiffs. In response to the administrative appeal, the Forest Service withdrew the original Deep Project ROD in May 2002 to perform additional analyses on the effects of the project. The Forest Service dismissed plaintiffs' administrative appeal of the original project as moot.

In July 2002, the Forest Service issued its Draft Supplemental EIS for the Deep Project. After receiving and considering comments, the Forest Service issued a Final Supplemental Environmental Impact Statement (FSEIS) in January 2004.

According to the FSEIS, the stated purpose of and need for the Deep Project is to: (1) move the landscape-level diversity of vegetation and associated wildlife habitat closer to the Historic Range of Variability (HRV) in terms of species composition, stand density and structure given that forest vegetation is outside HRV for 57% of the watershed; (2) increase the amount of single strata late and old structure (LOS) stands and move the amount of LOS closer to the HRV; (3) reduce the forest's susceptibility to moderate and high severity fires by reducing fuels levels, lowering stand densities, and re-introducing fire into the watershed given that larger areas of the forest are susceptible to stand-replacing wildfires; (4) reduce the forest's susceptibility to insects, diseases, and wildfires by reducing stocking levels; (5) enhance vegetative conditions in the aspen, riparian, upland shrub, and meadow communities that have gradually declined over time; and (6) improve water quality and enhance the vegetation aspect of aquatic/riparian areas that have been degraded from past conditions to provide for long-term sustainability of resident and anadromous fisheries by reducing stream temperatures and lowering sedimentation. AR 4421–23.

On January 16, 2004, the Forest Service issued the ROD challenged herein and selected modified Alternative C, which included commercial timber harvest on 6,261 acres, precommercial thinning on 9,957 acres, 6.1 miles of new and temporary road construction, 16.3 miles of road reconstruction, and fuel reduction treatments on 5,379 acres. AR 4885–4886. Modified Alternative C would allow logging of 12.8 million board feet of timber, primarily through ground-based tractor logging. *Id.*

In 1995, the Ochoco National Forest staff amended the Ochoco Land and Resources Management Plan (LRMP), adopting the Inland Native Fish Strategy (INFISH) to manage watersheds and provide interim native fish habitat direction. AR 4453. The timber management standards in INFISH require the Forest Service to designate portions of watersheds as Riparian Habitat Conservation Areas (RHCAs)

---

1. Scoping is the early stages of preparation of an environmental assessment (EA) or environmental impact statement (EIS) used to solicit public opinion, comments and suggestions, and determine the issues to be considered in the development and analysis of a range of alternatives.

2. Citations are to the Administrative Record filed by defendant (docket # 17).

where riparian-dependent resources receive primary emphasis, and management activities are subject to specific standards and guidelines. AR 784. The Deep Project originally allowed 24 acres of commercial harvest and 354 acres of precommercial thinning within RHCAs. AR 4885. Based on defendant's Notice of Administrative Development (# 98) filed March 23, 2006, the 24 acres of commercial harvest in RHCAs have been dropped from the project.[3]

Rocky mountain elk and mule deer use the Deep Project area on a year round basis. AR 4652. The Habitat Effectiveness Index (HEI) is a tool used to measure big game habitat quality. Quantity and quality of cover and open road density are the main factors influencing the HEI standard in the Ochoco National Forest LRMP. *Id.* HEI is currently 43.[4] The Forest Plan's standard is 35. Under Alternative C, HEI is expected to drop to 20, below the Forest Plan standard. AR 4653.

The FSEIS analyzed water quality and fish habitat issues. Ten streams in the Deep watershed are listed on Oregon's 303(d)[5] list as water quality impaired for the temperature criterion of 64 degrees for summer months, a temperature threshold designed to protect salmonid fish-rearing in the stream. AR 4514. Eight of the streams that are listed for temperature excesses are also listed as water quality impaired for habitat modification. *Id.* The FSEIS states that stream temperatures are not expected to increase over the long term (1–5 years) as a result of stand treatment activities. AR 4575. However, the Forest Plan standard of greater than 80% surface shade is not being met in 94% of

the planning area. AR 4513. Contributors to this condition are road development adjacent to stream channels, past harvest activity along portions of stream channels, and livestock and big game utilization in riparian areas. *Id.* The Relative Erosion Rate (RER) model was used by the Forest Service to predict the potential of sediment delivery to streams in the project area. The FSEIS RER model shows potential sediment increases from 2002–2007 based on harvest, prescribed fire and road activities. AR 4576.

Finally, the FSEIS analyzes the effects of livestock grazing on aquatic conditions in the project area. The FSEIS acknowledges that livestock grazing will continue to play a role in the future condition of riparian vegetation and water quality. AR 4613. Also, grazing could be a limiting factor in the project's ability to meet the purpose and need of enhancing certain vegetative conditions. *Id.*

## ANALYSIS

Plaintiffs present seven arguments in support of summary judgment, which this court construes as eight by separating the NEPA and NFMA claims contained in plaintiffs' fourth claim as to the habitat effectiveness analysis.

*Claims under the National Environmental Policy Act (NEPA)*

A. Consideration of a Reasonable Range of Alternatives

■ Plaintiffs argue that the Forest Service did not consider a reasonable range of alternatives to Modified Alternative C because it did not analyze in detail a

---

**3.** The 354 acres of precommercial thinning within RHCAs remain part of the Deep Project.

**4.** An HEI number represents a relative value of habitat conditions based on the potential of

the habitat type to provide cover, the quality of existing cover, and the miles of road open to vehicular traffic.

**5.** 33 U.S.C. § 1313(d).

restoration-only alternative that included no commercial timber harvest. The Forest Service responds that it considered the restoration-only alternative but dismissed it for failure to meet the purpose and need of the project as described in the EIS. Plaintiffs claim that the Forest Service's determination not to consider a restoration-only alternative in detail because it would not meet the Deep Project's "purpose and need" was flawed and inadequately supported in the administrative record.

■ Under NEPA, an agency must discuss alternatives to the proposed action in an EIS. 42 U.S.C. § 4332(2)(C)(iii). The regulations implementing NEPA require that an EIS consider and assess the environmental consequences of the proposed action and reasonable alternatives to that action. 40 C.F.R. § 1502.14. An agency preparing an EIS must specify the underlying purpose and need for the proposed action, 40 C.F.R. § 1502.13, and the project's alternatives derive from the Purpose and Need section of the EIS. *Westlands Water District v. U.S. Dep't of the Interior*, 376 F.3d 853, 865 (9th Cir.2004) (citations omitted). Courts review an EIS's range of alternatives under the "rule of reason." *Id.* at 868 (citing *City of Carmel-by-the-Sea v. U.S. Dep't of Transp.*, 123 F.3d 1142, 1155 (9th Cir.1995)). Under the rule of reason, the EIS need not consider an infinite range of alternatives, only reasonable or feasible ones. *Id.* (citing 40 C.F.R. § 1502.14(a)-(c)). *Id.* (citations omitted). Alternatives that do not advance the purpose of a project will not be considered reasonable or appropriate.

*Native Ecosystems Council,* 428 F.3d at 1247 (citing *Westlands,* 376 F.3d at 868).

Here, the Forest Service considered a restoration-only alternative, but briefly concluded that this alternative would not meet a major portion of the purpose and need for vegetation diversity in the high priority stands most in need of treatment. AR 4462. *See Oregon Natural Resources Council v. Goodman,* 382 F.Supp.2d 1201, 1205 (D.Or.2004) (finding plaintiffs not likely to prevail on a NEPA claim where restoration only alternative was rejected for failure to meet purpose and need). The Forest Service provided a brief description of its rationale for rejecting the restoration-only alternative. AR 4462 (devoting half of one page single-spaced to discussing this alternative in the FEIS). Alternatives that are eliminated from detailed study need only be briefly discussed. *American Rivers v. F.E.R.C.,* 201 F.3d 1186, 1200 (9th Cir.2000). Because the restoration-only alternative does not meet the purpose and need for the project and because it was briefly considered in the FEIS, this court recommends that plaintiffs' NEPA claim that the Forest Service failed to consider a reasonable range of alternatives be denied.

B. Disclosure of Scientific Controversy [6]

■ In 1993, the Forest Service proposed a timber sale (Shown Project) for the Deep Creek watershed. The decision notice for this sale was withdrawn in March 1994, and the project was never implemented. Plaintiffs claim that failure to disclose and discuss the Shown Project in the FSEIS for the Deep Project was not in accordance with law. Plaintiffs allege a

---

6. The court notes the Forest Service's arguments that the plaintiffs waived some of their NEPA and NFMA claims by allegedly failing to raise these issues in comments to the agency. Because this court finds that the agency was not arbitrary and capricious in approving the Deep Project and because all issues have been briefed by both parties, this court makes its recommendations based on the merits of this case and finds a ruling on the waiver issue unnecessary.

scientific controversy existed with regard to the Shown Project because some resource experts and consulting agencies had objections to the timber harvest in the area due to environmental concerns. Plaintiffs point to the ongoing logging, road building and grazing in the Deep watershed to show that the Forest Service should have considered the objections to the Shown Project as a scientific controversy applicable to the environmental concerns raised in connection with the Deep Project. The Forest Service argues that it has no responsibility under NEPA to discuss stale scientific data arising from a separate and never implemented timber sale project. The Forest Service further argues that between the years that the Shown and the Deep Projects were proposed, the agency completed a comprehensive watershed analysis, and that the Deep Project was designed explicitly to comply with INFISH and the Eastside Screens,[7] both of which were adopted after the Shown Project decision notice had been withdrawn.

■ NEPA requires the Forest Service to disclose and discuss scientific controversy in the environmental documentation for a proposed project. *Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1212–13 (9th Cir.1998). The court notes that plaintiffs concede that the Shown Project was never implemented and that NEPA does not require the Forest Service to discuss the effects of a project that did not and will not occur. Plaintiffs' Reply Memorandum at 15–16. Rather plaintiffs rely on the expert analysis about timber harvest and watershed conditions that were performed for the Shown Pro-

ject. This argument is unconvincing because the Shown Project and the Deep Project are different in scope and size, and the intervening years between the two projects call into question the relevance of the former's scientific data. *See Lands Council v. Powell*, 395 F.3d 1019, 1031 (9th Cir.2005) (explaining that six year old data was outdated and should not be relied upon by Forest Service). While NEPA requires the Forest Service to disclose and discuss scientific controversy in the environmental documentation for a proposed project, there is no requirement to disclose and discuss unimplemented projects, especially ones that are remote in time, of different scope, and do not share the same purpose. Because plaintiffs have failed to show that a scientific controversy existed that was not properly disclosed or discussed in NEPA documentation for the Deep Project, this court recommends that plaintiffs' NEPA claim be denied.

## C. Cumulative Effects

■ Plaintiffs argue that the Forest Service failed to adequately consider the direct, indirect and cumulative effects of all past, present and reasonably foreseeable federal and non-federal activities in the Deep Project such that the decision to implement the project was arbitrary and capricious. Specifically, plaintiffs allege the Forest Service did not consider the cumulative environmental effects of other timber sales and grazing in the Deep planning area, and the effect of management activities on water quality. The Forest Service responds that its responsibility is to consider cumulative effects in aggregated form rather than on a piecemeal basis,

---

7. Eastside Screens is an abbreviation for Forest Plan Amendment # 2, also known as Regional Forester's Interim Direction Establishing Riparian, Ecosystem and Wildlife Standards for Timber Sales. Originally signed in 1994 and amended in 1995, the

objective of this direction was to provide an approach for maintaining future planning options concerning wildlife habitat associated with late and old structural stages, and old forest abundance. AR 4674.

and that the FSEIS contains a thorough and sufficient discussion of cumulative effects to satisfy the agency's duty under NEPA.

Regarding timber sales, plaintiffs point to reports from a soil scientist (AR 4393) and the Environmental Protection Agency (EPA) (AR 1776, 1782) to support their argument that the Forest Service failed to disclose and discuss the impacts of individual past and future timber sales in the Deep planning area. Plaintiffs argue that future timber sales were in the planning stage at the time the Forest Service was considering the Deep Project, and that more than 34,000 acres of the Deep Creek watershed have been logged in the last 25 years. AR 4106, 2478–80. The Forest Service argues in turn that the agency is not required to analyze past, present and future actions on an individual basis, but rather to consider the effects of these actions in the aggregate, analyzing the incremental impact in the context of the proposed action that is subject to analysis in the EIS.[8]

As to the cumulative impact of grazing in the planning area, plaintiffs argue that the Forest Service does little more than explain that grazing (primarily cattle) is an ongoing activity in the planning area, and that it will continue in the future. AR 4544. Plaintiffs claim the Forest Service's treatment of grazing in the Deep planning area is unlawful because the FSEIS fails to adequately discuss the environmental consequences of past, present and reasonably foreseeable future grazing in the planning area, in combination with other impacts of the Deep Project; and because the agency failed to assess the effects of grazing on areas of the watershed that have already experienced some environ-

mental degradation. Plaintiffs point to comments from EPA and the Oregon Department of Fish and Wildlife (ODFW) that criticize the Forest Service's lack of analysis as to the effects of grazing in combination with timber harvest on water quality issues. The Forest Service argues that the cumulative effects analysis of grazing in the FSEIS was sufficient to meet the requirements of NEPA and that the plaintiffs' interpretation of the statutes, regulations and caselaw errs in describing the need for detailed and in-depth discussion of effects of individual past, present and future actions.

On the issue of water quality, plaintiffs argue that the Deep Project's FSEIS fails to take a "hard look" at the effects of sediment loading and road building activities from the timber sale on water quality in the watershed, and fails to provide scientific support for the conclusion that the Deep Project will actually improve water quality and fisheries habitat. Specifically, plaintiffs point to increases in relative erosion rate (RER) values over the six years of the Deep Project's implementation, and argue that increases in sediment are the result of timber harvest, prescribed fire, and road activities. AR 4576, 4133. Plaintiffs clam the FSEIS should have disclosed and analyzed the effects of a cumulative increase in sediment over the six-year implementation period, and the extent and magnitude of road building activities. The Forest Service argues that the cumulative effects analysis as to water quality in the FSEIS was sufficient to meet NEPA's requirements and cites generally to the administrative record to support its position.

■ NEPA requires that environmental documents for a proposed action disclose

8. The court notes that the Forest Service relied heavily on a CEQ guidance memorandum (Exhibit E to Defendant's opening brief) on cumulative effects which was stricken by this court on January 12, 2006, as a post-hoc rationalization and not an interpretation of law in effect at the time the agency made its decision (# 70).

and contain a thorough discussion of the direct, indirect and cumulative effects of past, present and reasonably foreseeable future action. 40 C.F.R. § 1508.7. The Supreme Court recently construed this regulation and found it required an evaluation of the incremental impact of the project at issue rather than focusing on the incremental impacts attributable to each of the past, present and reasonably foreseeable future actions in the planning area. *Dep't of Transportation v. Public Citizen,* 541 U.S. 752, 769–70, 124 S.Ct. 2204, 159 L.Ed.2d 60 (2004). Thus, the Court in *Public Citizen* approved an agency's approach that considers the effects of past actions in the aggregate, and explained that actions need not be considered separately and distinctly when analyzing cumulative effects.

The Ninth Circuit has explained that a proper consideration of the cumulative impacts of a project requires "some quantified or detailed information" and that general statements about possible effects and some risk "do not constitute a hard look absent a justification regarding why more definitive information could not be provided." *Klamath–Siskiyou Wildlands Center v. Bureau of Land Management,* 387 F.3d 989, 993–94 (9th Cir.2004) (citations and quotations omitted). However in *Klamath–Siskiyou,* the court was addressing environmental assessments in finding the Bureau of Land Management's analysis of cumulative effects deficient. *See also, League of Wilderness Defenders v. Forsgren,* 184 F.Supp.2d 1058, 1069–70 (D.Or. 2002) (finding Forest Service's EA inadequate under NEPA); *League of Wilderness Defenders v. Zielinski,* 187 F.Supp.2d 1263, 1271–72 (D.Or.2002) (same). Here, the Forest Service has prepared not only an EIS but a Final Supplemental EIS after years of review and analysis of information on the project. In a recently decided case, the Ninth Circuit found that a decision notice/finding of no significant impact (DN/FONSI) had sufficiently analyzed cumulative impacts when considered in light of "other recent projects and fires" in the national forest in question. *Native Ecosystems Council v. U.S. Forest Service,* 428 F.3d 1233, 1244 (9th Cir.2005).

■ This court has reviewed the portions of the administrative record that contain the Forest Service's analysis of cumulative impacts. On the issue of timber sales, the FSEIS discusses cumulative effects from past vegetation management activities in the watershed to a sufficient degree. With regard to future projects, the FSEIS states that no other timber vegetation management activities are planned within this watershed within the foreseeable future. AR 4590. This distinguishes the Deep Project from other timber harvest cases where courts found that multiple planned timber sales in one area required consideration of cumulative effects as to timber management activities. *See, e.g., Blue Mountains Biodiversity Project v. Blackwood,* 161 F.3d 1208, 1214–16 (9th Cir.1998). Also, any future vegetation management proposals would analyze the effects on LOS. AR 4595. Overall, the effects of management activities are analyzed in the context of moving greater portions of the land base closer to the historic range of variability (HRV), part of the purpose and need for the Deep Project. *See Oregon Natural Resources Council,* 382 F.Supp.2d at 1205 (Forest Service's purpose and need of restoring conditions to within the HRV was reasonable).

■ On the issue of water quality, the FSEIS discusses the fact that past projects have had undesirable effects on streams including more road crossings and increased sediment. AR 4569. The analysis goes on to describe activities that will reduce long-term sediment yields such as road closures and decommissionings, ripar-

ian planting, and changes in livestock grazing including exclosures which are areas of land enclosed by a barrier to protect vegetation and prevent grazing by animals. AR 4569–71. Proposed activities are intended to reduce stream temperatures, reduce sediment yield, and generally reduce the potential for adverse effects to streams and fish habitat. AR 4571. While harvest and road activities contribute to potential increase in sediment in the short-term, the RER analysis points to sediment delivery decreases over time. AR 4576.

■ The FSEIS also discusses the cumulative effects of grazing in the discussion of vegetation treatments and efforts to improve riparian vegetation. AR 4599. While livestock plays no role in the overstory stand composition, structures, or density aspects of the Deep Project's purpose and need, the Forest Service acknowledges that grazing could limit the ability to obtain the objectives of enhancing vegetative conditions of riparian and other communities. AR 4613. However, the Forest Service maintains that increased use of riparian areas by cattle will be mitigated because of limited thinning within the riparian areas, the use of "no treatment" buffers along streams, and a host of other requirements. AR 4613. Whether these actions will be sufficient to accomplish the purpose of limiting the negative effects of grazing is unknown, however this court does find that the Forest Service provided sufficient information on the cumulative effects to satisfy its duty under NEPA.

Overall, this court finds that the FSEIS contains "a reasonably thorough discussion of the significant aspects of the probable environmental consequences" of the project. *Neighbors of Cuddy Mountain v. Forest Service,* 137 F.3d 1372, 1376 (9th Cir.1998) (citations omitted). This court further notes that the Forest Service's decision to remove the 24 acres of commercial logging in RHCAs from the project suggests consideration of cumulative effects by the agency in that this decision was likely motivated by concerns over the impacts of grazing on the Deep watershed. Because the Forest Service provided sufficient consideration of the cumulative effects of timber sales, grazing and management activities on water quality in the Deep Project area, this court recommends denying summary judgment on this issue.

### D. HEI Values

■ Plaintiffs argue that the FSEIS contains an analysis of deer and elk habitat effectiveness that does not comply with NEPA. To accomplish the goal of providing high quality habitat for deer and elk, the forest plan uses a tool known as the Habitat Effectiveness Index (HEI) to assess big game habitat capability. Quantity and quality of cover, and open road density are the main factors influencing the HEI standard contained in the Ochoco National Forest's LRMP. Plaintiffs allege that the HEI values cited in the FSEIS are incorrect and that failure to disclose the correct values prevents adequate analysis of the impact to big game from the Deep Project. The Forest Service explains that it disaggregated the forest-wide HEI values in the Ochoco LRMP into more site-specific values for the Deep watershed and that it is those site-specific values that appear in the Deep Project's FSEIS.

This court finds that the Forest Service's use of the disaggregated HEI values to determine habitat effectiveness for the management areas within the Deep watershed does not violate NEPA. The values in the FSEIS represent the agencies efforts to calculate an HEI on a site-specific basis which does not violate the LRMP requirement that such calculations reflect the average values for the LRMP and that overall objectives continue to be met. Because

the Forest Service is entitled to deference specifically on technical matters, this court recommends that plaintiffs' NEPA claim as to the HEI values be denied.

*Claims under the National Forest Management Act (NFMA)*

A. HEI Reduction

 Plaintiffs argue that the Deep Project's HEI reduction violates the forest's LRMP for allowable habitat reduction for specific projects. The alternative chosen by the Forest Service in the ROD is expected to reduce HEI from its current level or 43 to a level of 20. AR 4653. Plaintiffs argue that this reduction will have an adverse effect on deer and elk in the planning area. The Forest Service argues that short-term reduction in HEI is consistent with the LRMP for the forest if long-term HEI values are achieved, and that an HEI level of 20 is above the HEI targets for decades three, four and five of the LRMP.[9] AR 4565, 4653.

The standards and guidelines of the LRMP provide for the management of deer and elk in the Deep watershed and the HEI analysis in the FSEIS is guided by the LRMP. The agency's decision to reduce habitat effectiveness in the short-term to meet the goal of achieving long-term HEI values is given due deference by this court as the decision of an agency interpreting and applying its own planning documents. *See Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1098 (9th Cir.2003). For these reasons, this court recommends that plaintiffs' claim as to HEI reduction as violating NFMA be denied.

B. INFISH Standard

 Plaintiffs argue that the Deep Project will violate the INFISH timber management standard by allowing timber harvesting in riparian habitat conservation areas (RHCAs). Also, plaintiffs allege that timber harvest in RHCAs will increase sediment delivery in the watershed and increase stream temperatures, negatively impacting redband trout. Under the alternative chosen in the ROD, the Forest Service has authorized 354 acres of pre-commercial thinning and 81 acres of "aspen enhancement" in RHCAs. The ROD also authorized 24 acres of commercial harvest but those acres were withdrawn on March 22, 2006 (docket #98, exh. 1).[10] The Forest Service argues that treatments within RHCAs that are carefully tailored to enhance riparian conditions over time are allowed under INFISH, even if some short-term negative effects are possible. Further, the Forest Service argues that it determined in the FSEIS, consistent with INFISH, that the Deep Project may impact redband trout individuals or habitat, but would not likely contribute to a trend towards federal listing *or* loss of viability to the population or species.

While plaintiffs claim that INFISH does not distinguish between short and long-term consequences and that any actions that reduce habitat quality are inconsistent with the purposes of INFISH, the court notes the Forest Service's argument that the no-harvest stream-side buffers in the Eastside Screens were superseded by INFISH and that INFISH *per se* does not preclude timber harvest in RHCAs. Thus,

9. As of January 2004, the LRMP is in the beginning of the second decade. AR 4565.

10. Plaintiffs' response to defendant's notice of new administrative development (#101) attempts to cast doubt as to whether the decision to remove the 24 acres of commercial harvest from the Deep Project is legitimate in that notification of this development was in the form of a letter to the public, and that the Forest Service has not withdrawn the ROD approving commercial harvest. For purposes of its analysis, the court herein assumes that the 24 acres have been dropped from the Deep Project and advises the Forest Service to provide official notice of this decision.

if INFISH had intended to prohibit all timber harvesting in riparian areas, it could have been written and implemented to do so. As the INFISH guidance memorandum submitted by the Forest Service explains, some short-term negative effects are acceptable if necessary to allow for projects that will manage and restore areas for the long-term recovery of habitats and/or populations.

This court is not persuaded that the reasoning in *Pacific Coast Federation of Fishermen's Ass'n v. Nat'l Marine Fisheries Service*, 265 F.3d 1028, 1037–38 (9th Cir.2001), an Endangered Species Act (ESA) case, applies here. In *Pacific Coast*, the court found that the agency did not dispute that short-term habitat degradation had the potential to jeopardize listed fish populations such that the agency's failure to assess degradation in the short-term was arbitrary and capricious. *Id.* Here, the administrative record does not clearly show that there will be significant negative impacts to redband trout. The court has examined the voluminous administrative record, including the Fisheries and Hydrology Report, and finds that the Forest Service's analysis for the conclusion that riparian conditions will improve and that negative impacts to redband trout will not be significant as a result of the Deep Project is sufficient. Unlike the environmental assessment at issue in *League of Wilderness Defenders v. U.S. Forest Service* (Bandit II), Findings and Recommendation, CV 03–1563–AS, 2005 WL 3307087 (June 6, 2005),[11] the final supplemental EIS at issue here contains a sufficiently detailed analysis of the effects of the project on redband trout such that the Forest Service's decision to implement the Deep Project was not arbitrary and capricious.

## C. Connectivity

■■■ Plaintiffs argue that the Deep Project fails to maintain connective habitat corridors in the planning area as required by the Eastside Screens. Plaintiffs point to the fact that many of the connective corridors in the Deep planning area already fail to meet the requirements of the Eastside Screens directive, and that further timber harvest in those corridors will only exacerbate the problem. The Forest Service argues that plaintiffs incorrectly focus their connective corridor inquiry on the planning area as a whole rather than the particular tree stands within a corridor presently serving connectivity.

The FSEIS states that connectivity corridors have been mapped and explains that the alternative chosen in the ROD will meet the forest plan's standards and guidelines for connectivity of LOS and old growth. The FSEIS also explains that of the 3,966 acres identified in connectivity corridors, 23% currently are in the upper one-third of site potential, meaning that 77% of the planning does not comply with connectivity requirements of Eastside Screens. Plaintiffs argue that this means logging can not be authorized in any connective corridors. The Forest Service points out that no change in the these percentages will result from the proposed actions of the Deep Project. Thus, there will be no additional violation of the connectivity requirements of the Eastside Screens by implementation of the Deep Project. Because plaintiffs have failed to show that Eastside Screens will be violated by the Deep Project's actions in connective corridors, this court recommends denying plaintiffs' NFMA claim on this issue.

---

**11.** This Findings and Recommendation was never adopted because the case subsequently settled.

## D. Leave Tree Markings

Plaintiffs argue that the Forest Service's marking of trees for cutting will result in trees equal to or greater than 21 inches in diameter breast height (dbh) being cut in violation of Eastside Screens and the forest's LRMP. Plaintiffs also allege that trees will not be marked by Forest Service personnel which they claim is a violation, and that the language of the timber sale contract is insufficient to ensure that the large trees will not be cut.[12] The Forest Service argues that the ROD specifies that no trees larger than 21 inches dbh will be cut, and that pre-work discussions with purchasers and operators will ensure that the Forest Service's directions will be followed strictly during implementation of the Deep Project.

At oral argument, the court urged the Forest Service to provide further assurances that large trees were marked correctly and so that they would not be inadvertently cut in violation of Eastside Screens. In response, the Forest Service offered declarations of two Forest Service employees that detail the process for marking trees for harvest, and the protections in place to ensure that trees greater than 21 inches dbh are not cut. In addition, the contract that will be awarded for the Lone Goat Timber Sale, which includes the trees which most concern plaintiffs, will include a liquidated damages clause to be assessed against the purchaser if any unauthorized harvest occurs. According to the declarations, the trees were marked by Forest Service employees and the marking complied with NFMA's requirements. This court is satisfied that the Forest Service has marked trees correctly and recommends that plaintiffs' tree marking claim be denied.

## CONCLUSION

For the foregoing reasons, this court recommends denying plaintiffs' motion for summary judgment (# 19) and granting defendant's motion for summary judgment (# 48). Plaintiffs' motions to strike (# 74, 84, 88, 103) are denied as moot as this court did not consider the materials submitted by the defendant in making its recommendation in this case. A judgment should be prepared dismissing this action with prejudice.

## SCHEDULING ORDER

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due June 21, 2006. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date. If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

Dated this 6th day of June, 2006.

---

12. Plaintiffs cite to 16 U.S.C. § 472(g) for language under NFMA that explains that marking of trees, when necessary, shall be conducted by Secretary of Agriculture employees, and that contract provisions and oral discussions are inadequate to comply with NFMA's tree marking requirements.